# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# EASTERN DIVISION

| | |
|---|---|
| **MICHAEL BONNER,** *et al.*, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | Case No. 3:15-cv-613-DAB |
| ) | |
| **TRUSTMARK CORP.,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Michael Bonner, claims serious personal injuries resulting from being shot and robbed by a masked assailant while Bonner was making a night deposit at the Trustmark Bank located on Thomason Drive in Opelika, Alabama. The Trustmark Bank is owned and operated by Defendants, Trustmark Corporation and Trustmark National Bank (collectively "Trustmark" or "Defendants"). Bonner and his wife, Angela Bonner, sued Trustmark for negligent failure to warn, negligent failure to use adequate means of protection, gross negligence, recklessness, and wantonness. (Doc. 1).

Pending before the court is Defendants' Motion for Summary Judgment (Doc. 20), Plaintiffs' response in opposition (Doc. 27), and Defendants' reply (Doc. 30). The matters have been fully briefed, and the court heard oral argument on April 20, 2017. For the reasons stated herein, Defendants' motion for summary judgment (Doc. 20) is **GRANTED**.

Also pending is Defendants' motion to strike the affidavit of Plaintiffs' expert, Howard B. Wood, (Doc. 29), Plaintiffs' response in opposition (Doc. 32), and Defendants' reply (Doc. 36). That motion is **DENIED as moot.**

I.      **JURISDICTION**

Plaintiffs invoke the subject-matter jurisdiction of this court based upon diversity of citizenship and an amount in controversy in excess of seventy-five thousand dollars. 28 U.S.C. § 1332(a). The parties do not contest personal jurisdiction or venue, and the court finds sufficient information of record to support both. See 28 U.S.C. § 1391. The parties consented to Magistrate Judge Jurisdiction for all matters pursuant to Rule 73, Fed. R. Civ. P., and 28 U.S.C. § 636(c), (Docs. 33, 34) and an order was entered reassigning the case to the undersigned as the presiding judge. (Doc. 35). Defendants have moved for summary judgment, arguing that Alabama law does not recognize a cause of action against a landowner under the circumstances of Mr. Bonner's attack.

II.     **SUMMARY JUDGMENT STANDARD OF REVIEW**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Summary

judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Southwest Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1263 (quoting *Anderson*, 477 U.S. at 251–52).

## III. BACKGROUND AND FACTS[1]

The matters set forth here are either undisputed or stated, as they must be for purposes of the present motion, in the light most favorable to Plaintiffs, Michael and Angela Bonner.

On August 23, 2013, at approximately 4:45 a.m., Michael Bonner was attempting to make a deposit at Trustmark's Opelika branch after-hours deposit box when he was shot once in the abdomen at close range and robbed by an unknown assailant. The assailant's bullet remains in Mr. Bonner's body. On the date of the incident, Mr. Bonner was making a night deposit on behalf of his employer, JTM Corporation d/b/a Piggly Wiggly, for whom he was the manager of the Opelika branch store. As a manager of the Piggly Wiggly store responsible for both making bank deposits and supervising the store, Mr. Bonner found it necessary to use Trustmark's after-hours deposit box to avoid teller service delays of 45 minutes to an hour during Trustmark's ordinary

---

[1] Except as noted otherwise, the background and facts are taken from Plaintiffs' statement of facts. (Doc. 27 at 2–7).

3

business hours. Mr. Bonner would ordinarily be accompanied when making early morning deposits by another employee, typically Piggly Wiggly's deli manager. On the morning of the 23rd, however, the deli manager was preoccupied with issues in the deli department and was unavailable. Mr. Bonner therefore drove alone to the Trustmark Bank to complete the deposit before the Piggly Wiggly store opened at 6:00 a.m.

The Trustmark Opelika branch bank features a single after-hours deposit box located on the bank's front wall at the northwest corner of the building. The after-hours deposit is provided for the convenience of customers given that Trustmark banks generally close between 4:30 p.m. and 5:00 p.m. The deposit box is not aligned with the ATM drive-through lanes and is a walk-up box that can only be accessed on foot. There is shrubbery immediately in front of the after-hours deposit box, on the other side of which is a flood light. Facing the after-hours deposit, ATM drive-through lanes extend to the left, beyond which is the bank's property line and a field not owned by Trustmark. The bank is bounded by Thomason Drive on the front, a commercial drive to the right, and two undeveloped, open fields not owned or maintained by Trustmark to the left and rear. The field to the rear contained a ditch, shrubbery and trees. The field to the right, at the time of Mr. Bonner's assault, contained tall grass and trees. Beyond the fields toward the rear are train tracks.

From the acquisition of the Opelika Trustmark bank in March 2013 through the time of Mr. Bonner's August 23, 2013 assault, Trustmark had in effect a written security policy with regard to its ATMs and after-hours deposit boxes ("AHDs"). The policy was maintained in two parts. A detailed foot-candle light power standard was maintained by Trustmark's centralized corporate security office entitled "ATM/AHD Safety Requirements." This policy constituted a standard and set forth specific foot-candle measurements at determined distances applicable to all ATMs and

4

after-hours deposit boxes, including after-hours deposits physically connected to branch banks (not merely remote ATMs/AHDs). The standard was then summarized and distributed to branch banks through Trustmark's Security Manual. Section 7 of the Security Manual set forth physical security standards for proper lighting, proper maintenance of trees and shrubbery, and mandatory video camera surveillance for all after-hours deposits.

With regard to lighting, the branch manual provided that "during the hours of darkness, the area surrounding remote ATMS and AHDs will be well lighted to provide maximum security for customers, associates and the facility." Landscaping was to be "properly maintained" such that trees, shrubbery, and grass were "closely trimmed in order to maintain visibility and deprive potential criminals of concealment." The security measures in the branch Security Manual and the detailed requirements maintained by corporate security were part of the same security policy, which constituted a security standard for branch banks.

Section 7 of the Trustmark Security Manual expressly states that Trustmark's security standards are intended for the safety of the bank's customers. Wayne Hart, Security Officer for the Opelika bank and surrounding region at all times relevant to this case, testified at deposition that a well-lit premises provides a safer environment, can be a deterrent to crime, and that in the evening hours it can "protect your facility, your customers, your employees," including "patrons using the ATM or night drop." As Security Officer, Mr. Hart was the individual responsible for ensuring branches within his region, including the Opelika bank, complied with Trustmark's written policy standards, including completion of a physical security survey with foot-candle light testing at each branch bank every three years. Mr. Hart testified the foot-candle policy set forth minimum standards for branch banks, and that failure to maintain the stated lighting levels

5

constituted a breach of the policy. Likewise, potential concealment of a person intending to commit a crime was a concern for Mr. Hart as a security officer because "we took security seriously." Mr. Hart explained the corporate security ATM/AHD Safety Requirements maintained by corporate security required trees with trunks two or more inches in diameter to be trimmed bare up to a height of seven feet so branches "would hopefully be out of arm's reach from anyone that could possibly climb in the tree, possibly hide or something like that."

There is no evidence of criminal activity in the area of the Trustmark branch prior to the attack on Mr. Bonner. (Doc. 30-1 at 41–47). Likewise, there is no evidence that Trustmark had any knowledge of any such activity. (Doc. 20-2).

## IV.   PLAINTIFFS' CLAIMS

Count I alleges Defendants failed to take care to discover the type of harm that befell Bonner and failed to give an adequate warning to enable Bonner to avoid the harm or take action to protect himself against it. (Doc. 1, ¶ 53). In Count II, Plaintiffs allege that given Defendants' past experience with criminal conduct at the premises, the Defendants failed to use adequate means to make the premises safe for invitees. *Id.*, ¶¶ 56–63. Specifically, Plaintiffs claim the Defendants were negligent in failing to provide lighting above or near the night deposit box that was sufficient to deter criminal conduct, to install or maintain working closed-circuit cameras near the night deposit box, to ensure the lighting and closed-circuit cameras were operational and in the direction of the night deposit box, to prevent natural or artificial visual obstructions, to put the night deposit box in a drive-through lane where customers would not need to exit their cars or in a key-card access locked foyer, and to employ safety precautions to ensure the Bank's invitees are safe. *Id.*,

¶ 61. Count III alleges gross negligence, wantonness, and recklessness. *Id.*, ¶¶ 64–71. Count IV asserts a consortium claim on behalf of Angela Bonner. *Id.*, ¶¶ 72–73.

V. ANALYSIS

Although Plaintiffs' claims are as set forth above, in opposing the motion for summary judgment, they make essentially two arguments: A) application or extension of standard Alabama common law as to the responsibility of a landowner regarding criminal acts occurring on its property and B) Trustmark's creation of internal standards for lighting and other safety measures set a standard, violation of which provides a basis for expanded liability.

Plaintiffs do not make an extended argument as to common law premises liability, and controlling case law bars this claim. The well-established rule in Alabama is that a premises owner is not liable for injuries to its invitees caused by the criminal acts of third persons absent special circumstances or a special relationship. *See, e.g., Baptist Mem. Hosp. v. Gosa*, 686 So. 2d 1147, 1149 (Ala. 1996); *Broadus v. Chevron USA, Inc.*, 677 So. 2d 199, 203 (Ala. 1996); *Steiger v. Huntsville City Bd. of Educ.*, 653 So. 2d 975, 977–78 (Ala. 1995); *Saccuzzo v. Krystal Co.*, 646 So. 2d 595, 596 (Ala. 1994); *Moye v. A.G. Gaston Motels, Inc.*, 499 So. 2d 1368, 1370 (Ala. 1986). The "singular exception to this general rule" is when "the particular criminal conduct was foreseeable." *Moye*, 499 So. 2d at 1371 (citing *Henley v. Pizitz Realty Co.*, 456 So. 2d 272, 277 (Ala. 1984)). Historically, Alabama courts have been extremely reluctant to apply this exception absent exceptional circumstances. *Williams v. First Ala. Bank*, 545 So. 2d 26, 27 (Ala. 1989); *See Moye,* 499 So. 2d at 1372–73 ("When the number and frequency of crimes on the premises rise, and notice is shown on the part of the owner, then, and only then, would criminal activity become reasonably foreseeable.").

To overcome this bar, a plaintiff must prove three elements: (1) the particular criminal conduct must have been foreseeable; (2) the defendant must have possessed "specialized knowledge" of the criminal activity; and (3) the criminal conduct must have been a probability. *Carroll v. Shoney's Inc.*, 775 So. 2d 753, 756 (Ala. 2000). In Alabama, very few cases have met this high standard.

Plaintiffs allege that Trustmark owed Mr. Bonner a duty because they knew, or should have known, that criminal activity is highly probable since the place of the business is in an area prone to high drug usage and frequent criminal activity. (Doc. 1, ¶ 39). However, the Alabama Supreme Court expressly rejected this contention in a similar case. In *Bailey v. Bruno's, Inc.*, 561 So. 2d 509 (Ala. 1990), plaintiff was attacked in the parking lot of a Bruno's Supermarket. *Id*. While the court acknowledged that criminal activity in the area had been on the rise, it held that this did not impose a duty upon the supermarket to protect its customers. *Id.* 510–11. In the present case, Plaintiffs merely allege the area has a "reputation" for criminal activity. However, Bonner was not aware of any robberies at the store where he worked which was five minutes from the bank. (Doc. 30-1 at 45). Furthermore, Mr. Bonner was not aware of any criminal activity at Trustmark's bank resulting from a night deposit, nor any criminal activity at all occurring at the bank prior to Bonner's attack. *Id.* at 41–43, 47. In fact, Mr. Bonner himself made drops in the early morning hours three to four times per week for eighty weeks with no issues prior to this incident. *Id.* at 71. Additionally, James Hurst, who has worked in the subject building since 2008, has absolutely no knowledge of any criminal acts on the subject property since 2008. (Doc. 20-2, ¶ 10). Mr. Hurst had no specialized knowledge that the criminal activity would occur and based on absolutely

criminal events occurring at that location within five years prior to the subject incident, there is no way Trustmark could be held responsible.

Alabama courts have specifically considered the issue of imposing liability for criminal acts of third persons that occur at banks. *See Berdeaux v. City Nat'l Bank of Birmingham*, 424 So. 2d 594 (Ala. 1982); *see also Williams v. First Ala. Bank*, 545 So. 2d 26 (Ala. 1989). In *Berdeaux*, the plaintiff was shot and injured when three armed thieves robbed the bank. *Berdeaux*, 424 So. 2d at 595. The plaintiff argued that banks owe a special duty to protect their customers due to the remote location and the presence of large amounts of money. *Id.* The plaintiff also argued that the introduction of branch banking, "TV tellers," and 24-hour ATMs increased the probability of violent crime and created an opportunity for criminals to rob bank customers. *Id.* The court unequivocally held that there was no "special duty" for banks to its customers, and that the bank was not liable for the criminal acts of the robbers. *Id.*

In this case, there is nothing in the history of the property or Mr. Bonner's status while using the bank that takes his attack outside the rule precluding landowner responsibility.

Plaintiffs argue at greater length that Trustmark breached a voluntarily assumed duty by ignoring its own safety standards regarding lighting, landscaping, video monitoring, and other aspects of branch design and operations. Trustmark acknowledges the existence of its internal standards, and Plaintiffs have presented substantial evidence that Trustmark failed to meet its own standards at this branch at the time of Mr. Bonner's attack. Plaintiffs rely on the principle that a duty of care, even if voluntarily assumed, imposes a standard of conduct, violation of which may result in civil liability, citing *Raburn v. Wal-Mart Stores, Inc.*, 776 So. 2d 137, 139 (Ala. Civ. App. 1999). Notably, Plaintiffs do not cite any authority for the general proposition that a landowner's

9

internal procedures, standards or guidelines create some kind of enforceable obligation toward visitors to the property. Indeed, it is difficult to understand how such a rule would operate in practice, inasmuch as it would penalize landowners from ever specifying how to conduct their business and property management.

As to *Raburn* itself, the case involved a retail store's attempted apprehension of a shoplifter who subsequently committed an assault. The allegedly negligent handling of an identified criminal on the premises is an ordinary application of general tort principles. Other than involving a retail facility and the acts of a third party criminal, the case has no bearing on the facts of Plaintiffs' claims here. The physical act of detaining a fleeing criminal is simply not comparable to making decisions as to lighting, surveillance, and other security measures.

Because of this disposition, the Court does not reach the issue of proximate cause regarding whether the deficiencies in Trustmark's implementation of its standards resulted in Mr. Bonner's injuries. Note that such determinations are normally reserved for the finder of fact. Likewise, the Court does not determine the merits of the motion to strike the Affidavit of Howard B. Wood, finding the issue to be moot.

## VI. CONCLUSION AND ORDER

In sum, in Alabama, under most circumstances, landowners have virtually no responsibility and little incentive (as a matter of tort law) to make their property safer with respect to assaults and other injuries caused by third parties. This Court has no authority to change the tort law of Alabama as determined by the courts and legislature of the state. In the absence of a change in the law, individuals concerned about third party attacks must look to their own decision making in choosing where and how to conduct their affairs.

For the reasons stated, it is **ORDERED:**

Defendants, Trustmark Corporation and Trustmark National Bank's motion for final summary judgment as to all claims of the Plaintiffs, Michael Bonner and Angela Bonner, (Doc. 20) is **granted**. Defendants' motion to strike the affidavit of Howard B. Wood (Doc. 29) is **denied as moot.** The Court will enter a separate final judgment, and the Clerk is directed to close this docket.

**DONE** and **ORDERED** this 3rd day of August, 2017.

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE